# SUPREME COURT—APPELLATE DIVISION—FIRST DEPARTMENT,

## April 30, 1915.

## THE PEOPLE ex rel. MORRIS LEDERMAN v. WARDEN OF CITY PRISON.

### (168 N. Y. 240.)

PUBLIC HEALTH—PRACTICE OF MEDICINE BY PHARMACY COMPANY IN VIOLATION OF PUBLIC HEALTH LAW.

A person who advertises under his trade name as "The Standard Pharmacy Company" to give a free medical examination, and employs a duly licensed physician for such purpose, and issues cards entitled, "Card for free examination. Medical and surgical office of The Standard Pharmacy Company," giving the address and directing the doctor to make examination and give medical advice to the bearer who is now using remedies of the company, and to make no charge to the holder of the card, but to charge the same to the company, and giving the office hours, may be deemed to hold himself out under his trade name as being able to diagnose and treat diseases, and hence, may be convicted of practicing medicine unlawfully, in violation of section 174 of the Public Health Law.

APPEAL by the relator, Morris Lederman, from an order of the Supreme Court, made at the New York Special Term and entered in the office of the clerk of the county of New York on the 19th day of March, 1914, dismissing the writ of habeas corpus herein and remainding the relator to custody.

*John L. Bernstein*, for the appellant.

*Robert C. Taylor*, for the respondent.

Order affirmed on the opinion of BIJUR, J., at Special Term.

Present—INGRAHAM, P. J., CLARKE, SCOTT, DOWLING and
HOTCHKISS, JJ.

The following is the opinion delivered at Special Term:

BIJUR, J.:

The relator, having been held by a magistrate to answer to
the Court of Special Sessions, applies for a writ of habeas cor-
pus. He was charged with practicing medicine unlawfully in
violation of section 174 of the Public Health Law (Consol.
Laws, chap. 45; Laws of 1909, chap. 49). Subdivision 7 of
section 160 of that act defines the practice of medicine and in-
dicates in substance that it consists in holding one's self out
as being able to diagnose or treat human diseases, and offering
or undertaking such treatment. This factor of holding out
apparently underlies all the important cases in which the de-
fendant has been held for violation of the law. There have been
laid before me, without objection, by the respective counsel,
extracts from the record in these cases. In People v. Wood-
bury Dermatological Institute (192 N. Y. 454) the advertise-
ments announced that "the Woodbury method succeeds, be-
cause it entirely removes these dead cells;" "we perfect baggy
skin;" "we correct unshapely noses, etc.;" "we remove
freckles, etc.;" "by methods of our own, we extract these dead
cells;" "all remedies prescribed by us are scientifically pre-
pared in our private laboratories." In the case of People v.
Dr. Weeks' Medical Office (126 App. Div. 950), in which the
judgment against the defendant below was affirmed on the au-
thority of the Woodbury Case (124 App. Div. 877), the ad-
vertisements read: "We treat all private and chronic dis-
eases;" "we cure by the best of medical ability;" "Dr. Weeks'
Medical Office, specialist for nervous and chronic diseases;"
"we cure all cases we undertake." In People v. Samuel Gross
(unreported), decided in the Court of Special Sessions in

November, 1911, the defendant was the proprietor of an institution known as the Workingmen's Medical Aid Society. One of the circulars contained the statement: "It is the object of the Workingmen's Medical Aid Society to furnish reliable medical service to members and their families." These various institutions, therefore, plainly held themselves out to diagnose and treat diseases just as do hospitals and dispensaries, but without the authority which such establishments expressly enjoy. As pointed out in the opinion in the Woodbury case in the Court of Appeals (at p. 458) the statute* expressly provides that they may specify in their certificate of incorporation " the systems of medical practice or treatment to be used or applied." The Woodbury, Weeks and Gross institutions announced that they themselves undertook to diagnose and to treat. The question, therefore, arises whether the relator is properly chargeable with the same offense. The evidence on which he was held is uncontradicted. He transacted business under the duly adopted trade name the " Standard Pharmacy Company." The testimony is that a lady called at the office of this " company," inquired whether the doctor was in, and on receiving an affirmative answer was referred to him. He is a duly licensed physician. He examined her, gave her a prescription, refused to receive any compensation, she had the prescription filled at the desk and paid therefor, and was again told that no charge would be made for the medical service. In adition to this evidence the record contains copies of the inscriptions on signs around the relator's establishment, a booklet of advertisments, and a " card for free examination." The signs are, perhaps, fairly beyond the purview of the statute. They read as follows: (a) " Standard Pharmacy Co." (b)

---

*See Membership Corporations Law (Gen. Laws, chap. 43; Laws of 1895, chap. 559), § 80, as amd. by Laws of 1900, chap. 404; now Membership Corporations Law (Consol. Laws, chap. 35; Laws of 1909, chap. 40), § 130. —[REP.

" Doctor's office.   Examination of urine, electrical treatment, X-ray examination and other modern scientific methods." (c) " Standard Pharmacy Co. medical office.   Entrance through drug store."   (d)   " Manufacturers of Standard Remedies." (e) " Examination of urine in order to determine the nature of the disease, and also to show a complete and reliable cure by our consulting specialist, free to our patrons who are using our valuable-well-tried, reliable and guaranteed prescriptions —The Celebrated Standard Remedies."   These signs may be interpreted as indicating merely that the relator is engaged in the manufacture of certain remedies; that he employs a physician, to whom patrons of his establishment may go for free medical advice, although the phrase " Standard Pharmacy Co. medical office," is rather suggestive.   It might, however, be claimed that a medical office imported no more than a place where medicines might be obtained.   The same may be said of the contents of the booklet.   One page contains, among others, the statement " Coupon.   Free medical advice to patrons. *   *   *   Consultation, examination and advice free by the consulting specialist of the Standard Pharmacy Co."   This might be regarded as unobjectionable, but the same cannot be said so clearly of the further recital: " The medical office of the Standard Pharmacy Co. is fitted up in the most complete manner with all the latest scientific medical and surgical apparatuses."   Without reviewing further extracts from this booklet it may be said, however, that the doubts which I entertain as to the legal propriety of the advertisements might properly be resolved in plaintiff's favor were it not for the card for free examination above referred to.   This reads as follows:

" Card for free examination.   Medical and surgical office of the Standard Pharmacy Co., 321–323 Bowery, corner 2d Street, New York, ——, 191–.

" To the doctor:

" Please make examination and give medical advice to

Bearer, who is now using——and charge same to Standard
Pharmacy Co.  Per——.  Make no charge to holder of card."
(On the reverse side) : " Office hours—Daily, 12: 30 to 2; even-
ings, 5 to 6: 30 [and] 8 to 9; Sundays 12 to 2."

I cannot regard this card as other than an announcement.
that the Standard Pharmacy Company maintains a medical and
surgical office, in charge of its doctor, who gives its patrons
examination and medical advice on its behalf.  I think that the
relator holds himself out under his trade name as being able to
diagnose and treat diseases and offers and undertakes to do
so.  The writ is, therefore, dismissed and relator remanded.