[Civ. No. 9875. First Appellate District, Division Two.—December 12, 1935.]

PACIFIC EMPLOYERS INSURANCE COMPANY (a Corporation), Respondent, v. SAMUEL L. CARPENTER, Jr., etc., Appellant.

U. S. Webb, Attorney-General, and Neil Cunningham, Deputy Attorney-General, for Appellant.

Hartley F. Peart, Howard Hassard, A. B. Bianchi and Anthony J. Kennedy, as *Amici Curiae* on Behalf of Appellant.

F. Britton McConnell and Christopher M. Bradley for Respondent.

SPENCE, J.—Petitioner is an insurance corporation qualified under the laws of this state to engage in the business of accident and health insurance. In 1931, it obtained approval by the insurance commissioner of one of its policy forms designated as MSP–2. (See Stats. 1917, p. 957.) In 1934, it sought approval of its form designated as MSP–5. It is agreed that, with certain·additions, this last-mentioned form was substantially the same as the form previously approved. The question of the legality of these forms was then raised and·was decided by the insurance commissioner adversely to petitioner. Form MSP–5 was therefore disapproved by the insurance commissioner and the approval theretofore given of form MSP–2 was revoked. Thereupon petitioner filed his petition for a writ of mandate in the superior court seeking to compel the respondent insurance commissioner to approve said forms. Copies of said forms were attached to the petition. Respondent filed a demurrer to the petition which demurrer was overruled and respondent was given time to answer. Respondent failed to answer and the trial court thereafter entered judgment directing the writ to issue as prayed. This appeal is taken from said judgment by the respondent insurance commissioner and, in order to avoid confusion, we will refer to the parties as petitioner and respondent throughout this opinion.

The respondent commissioner and *amici curiae* contend that the action of the commissioner was justified as the approval and issuance of the policies would result in petitioner's engaging in the unlawful practice of medicine and dentistry. Petitioner on the other hand contends that the issuance of these policies would not result in petitioner's engaging in the unlawful practice of medicine and dentistry. It claims that the policies are purely indemnity contracts containing all the "standard provisions" prescribed by statute (Stats. 1917, p. 957) and that the respondent commissioner "acted in an unjust, arbitrary manner and thus without lawful authority" in withholding approval of said policies. It therefore appears that the main question for consideration is whether the issuance of the policies would result in such unlawful practice as claimed by the respondent commissioner.

Before setting forth the terms of the policies, it may be stated that it is well settled that neither a corporation

nor any other unlicensed person or entity may engage, directly or indirectly, in the practice of certain learned professions including the legal, medical and dental professions. (*Painless Parker* v. *Board of Dental Examiners,* 216 Cal. 285 [14 Pac. (2d) 67]; *People* v. *Merchants Protective Corp.,* 189 Cal. 531 [209 Pac. 363]; *Pilger* v. *City of Paris Dry Goods Co.,* 86 Cal. App. 277 [261 Pac. 328]; *People* v. *California Protective Corp.,* 76 Cal. App. 354 [244 Pac. 1089]; *In re Eastern Idaho Loan & Trust Co.,* 49 Idaho, 280 [288 Pac. 157, 73 A. L. R. 1323]; *In re Otterness,* 181 Minn. 254 [232 N. W. 318, 73 A. L. R. 1319]; *People* v. *Association of Real Estate Taxpayers,* 354 Ill. 102 [187 N. E. 823]; *Unger* v. *Landlords' Management Corp.,* 114 N. J. Eq. 68 [168 Atl. 229]; *People* v. *John H. Woodbury Dermatological Institute,* 192 N. Y. 454 [85 N. E. 697]; *State* v. *Baker,* 212 Iowa, 571 [235 N. W. 313]; *Godfrey* v. *Medical Society of New York County,* 177 App. Div. 684 [164 N. Y. Supp. 846]; *People* v. *Painless Parker Dentist,* 85 Colo. 304 [275 Pac. 928]; *State* v. *Bailey Dental Co.,* 211 Iowa, 781 [234 N. W. 260]; *State Board of Dental Examiners* v. *Savelle,* 90 Colo. 177 [8 Pac. (2d) 693, 82 A. L. R. 1176]; *State Board of Dental Examiners* v. *Miller,* 90 Colo. 193 [8 Pac. (2d) 699]; *Hannon* v. *Siegel-Cooper Co.,* 167 N. Y. 244 [60 N. E. 597, 52 L. R. A. 429]; *Winslow* v. *Kansas State Board of Dental Examiners,* 115 Kan. 450 [223 Pac. 308]; *State* v. *Laylin,* 3 Ohio N. P. (N. S.) 185, affirmed 73 Ohio St. 90 [76 N. E. 567]; 6A Cal. Jur., p. 1260, sec. 722; 14A Cor. Jur., pp. 296, 297, 298, sec. 2145.) Under the foregoing authorities it is clearly declared unlawful for a corporation to indirectly practice any of said professions for profit by engaging professional men to perform professionel services for those with whom the corporation contracts to furnish such services. In other words, said authorities declare that said professions are not open to commercial exploitation as it is said to be against public policy to permit a ''middleman'' to intervene for profit in establishing the professional relationships between the members of said professions and the members of the public. (*Hightower* v. *Detroit Edison Co.,* 262 Mich. 1 [247 N. W. 97, 86 A. L. R. 509].)

In *Painless Parker* v. *Board of Dental Examiners,* 216 Cal. 285, the court said at page 298 [14 Pac. (2d) 67],

"The practice of dentistry is not open to commercial exploitation. Such would be its fate if the methods adopted by petitioner should become general. That a corporation may not engage in the practice of law, medicine or dentistry is a settled question in this state. None of those professions which involves a relationship of a personal as well as a professional character, which has to do with personal privacy, can be placed in the same category as druggists, architects or other vocations where no such relationship exists."

In *Pilger* v. *City of Paris Dry Goods Co.*, 86 Cal. App. 277, at pages 281 and 282 [261 Pac. 328, 330], the court said, "A corporation can neither practice law nor hire lawyers to carry on the business of practicing law for it, any more than it can practice medicine or dentistry by hiring doctors or dentists to act for it."

The subject is treated in 6A California Jurisprudence, page 1260, as follows: "There are certain professional occupations which a corporation is functionally incapable of engaging in, such as the practice of law, medicine and dentistry. A corporation is incapable of the relation of personal confidence and trust requisite to the attorney's relation to his client, and this is also true of the other professions in which there is a personal confidence. A corporation cannot evade these rules by hiring others to perform professional functions." The subject is also considered in 14A Corpus Juris, on pages 296, 297 and 298, and after stating that there are statutes in many states which prohibit corporations from practicing said professions, it is declared that, "Such statutes are merely confirmatory of the already existing law."

We now turn to a consideration of the policies before us. These policies are substantially the same for the purposes of this discussion and we will confine our consideration to policy form MSP-5. Said policy was entitled "Medical Service Policy". It provided for "Aggregate Service Benefits $1,250.00" and for "Accidental Death Benefits $1,000.00" payable in the manner hereinafter described. No provision was made for the payment of any disability benefits. The material provisions of said policy were as follows:

"Pacific Employers Insurance Company . . . agrees . . . that (the Insured) is entitled to, and the company agrees to pay for:

## "MEDICAL SERVICES

"In the manner and to the extent herein provided in the event of disease or injury, which may have inception after the effective date hereof and while this Policy is in force, and which does not arise out of the occupation of the Insured so as to come within the provisions of any Workmen's Compensation Law, scheme or plan."

## "AGGREGATE SERVICE BENEFITS $1,250.00.

"The total amount of liability of the Company payable for medical, surgical, hospital and other services combined, either consecutively or in the aggregate, shall in no event exceed the amount specified above as AGGREGATE SERVICE BENEFITS, during any twelve month period from the date of this Policy or from any anniversary date thereof."

## "SERVICE CONDITIONS

"The Company shall appoint a Medical Director who shall be a licensed physician and surgeon and the term 'Medical Director' used herein shall mean only such physician and surgeon appointed by the Company in writing and while such appointment is in effect and unrevoked.

"The Company or its Medical Director shall make written appointment of Licensed physicians and surgeons to render services in accordance with the provisions hereof who shall be termed 'designated physician'. The Company or its Medical Director shall also make written appointment of licensed dentists, oculists and optometrists to render service in accordance with the provisions hereof who shall be termed 'designated specialists'. The terms 'designated physician' and/or 'designated specialist' used herein shall mean only such physicians, surgeons, dentists, oculists and optometrists so appointed and while such appointment is in effect and unrevoked.

## "PHYSICIANS AND SURGEONS, HOSPITAL AND OTHER SERVICES PROVIDED

"Medical or surgical treatment by the Medical Director or a designated physician and hospitalization and the services of consultants and specialists when authorized by the Medical Director as hereinafter provided:

"OFFICE: The Insured is entitled to office care for a period not exceeding fifty-two (52) weeks for any one disease or injury or complications thereof for the purpose of treatment of the Insured therefor and may call at the offices of the Medical Director or any designated physician during office hours for physical examination, diagnosis and treatment which shall include:

"Any recognized diagnostic, preventive and curative medical and surgical measure, also necessary drugs, dressings and other materials, when dispensed by the attending physician, x-rays, massage, diathermy, ultra violet and other physio-therapeutical treatments, microscopical and other laboratory tests and analyses.

"HOME: The Insured is entitled to care at his or her home, at any time, day or night, for a period not exceeding twenty-six (26) weeks for any one disease or injury or complications thereof by a designated physician and to the services of consultants and specialists when authorized by the Medical Director, when the Insured is necessarily confined to bed or unable to call at the offices of the Medical Director or any designated physician."

"EMERGENCY TREATMENT: In case of extreme emergency (where any delay may prove fatal or cause additional disability) the Insured may call the nearest physician (M. D.) FOR FIRST AID ONLY. For such emergency treatment an allowance will be made to the attending physician in accordance with the schedule of fees adopted by the Company, providing the total amount for such emergency service shall not exceed $25.00. All further treatments must be rendered by a physician or surgeon approved by the Company."

"HEALTH PRESERVATION AND LIFE EXTENSION SERVICE: The Insured is entitled to annual complete physical examination at the office of the Medical Director or any designated physician and to consultation at such offices at any time while this Policy is in force relative to proper health preservation and life extension measures.

"DENTAL SERVICE. The Insured is entitled to annual examination and cleaning of the teeth by designated specialists.

"OCULIST AND OPTOMETRIST SERVICE: The Insured is entitled to annual examination of the eyes with

prescription for glasses, also treatment for acute eye disease and injuries by designated specialists.''

"ADDITIONAL PROVISIONS

"The Insured is entitled to the Medical Services herein specified only when under the exclusive care and supervision of the Medical Director and/or designated physician and/or designated specialist. In the event that the Insured places himself under the care of any person other than the Medical Director and/or a designated physician and/or a designated specialist, except as otherwise herein provided, the rights of the insured to all further benefits under this policy shall forthwith terminate.''

With regard to payment of the benefits under the policy, the policy itself provided, ''Indemnity for loss of life of the Insured is payable to the beneficiary if surviving the Insured, and otherwise to the estate of the Insured. All other indemnities of this policy are payable to the Insured.'' It should be noted, however, that the application form which was attached to and made a part of the policy, contained the following provision: ''I hereby request and authorize the Company to pay any indemnities due me under any policy issued upon this Application directly to the physicians, institutions or agencies rendering services. This request and authority is revocable by written notice to the Company at any time but such notice shall not effect the above request and authority with respect to medical services for any condition or its complications having inception prior to such written notice.''

Taking the policy by its four corners and considering all of its provisions, including those above set forth, we cannot escape the conclusion that it is basically and primarily an agreement by petitioner, in consideration of the premium paid by the insured, to furnish the designated professional services through its appointed staff consisting of its medical director, its designated physicians and its designated specialists. It necessarily follows that the issuance of such policies would result in petitioner's engaging in the unlawful practice of at least two of the learned professions, to wit, medicine and dentistry.

■ Petitioner takes the position that the policy constitutes a ''contract of indemnity between the insurer and the assured—nothing more'', but this position may not be sus-

tained. It is true that the policy contains certain provisions regarding the payment of indemnities as required in all standard form contracts, but the policy is more than a mere contract of indemnity. We believe petitioner's own designation of the policy as a "Medical Service Policy" more nearly describes the true nature of the agreement. It is essentially an agreement by petitioner to furnish medical services and other professional services through its own appointed staff of professional men rather than an agreement to indemnify against indebtedness incurred by the insured for such services with professional men of his own choosing.

We believe that an examination of the various provisions of the policy fully sustain the conclusions above set forth. Throughout this "Medical Service Policy" it is specified that "The Insured is entitled to" various professional services, including medical and dental services, under the terms and conditions set forth. One of the main headings of the policy reads "Physicians and Surgeons, Hospital and Other Services Provided". It is provided that petitioner will appoint a medical director, designated physicians and designated specialists "to render services in accordance with the provisions" of the policy, and that "The Insured is entitled to the Medical Service herein specified only when under the exclusive care and supervisions of the Medical Director and/or designated physician and/or designated specialist." It is further provided that if "the Insured places himself under the care of any person" other than those appointed by petitioner, "the rights of all further benefits under this policy shall forthwith terminate". The only exception made in this connection is for emergency treatment for first aid only, in which event "an allowance will be made to the attending physician in accordance with the schedule of fees adopted by the company, providing the total amount for such emergency treatment shall not exceed $25.00". The insured is further entitled to annual complete physical examination by petitioner's appointees and to office consultation at any time, to annual dental examination and cleaning of teeth by petitioner's appointees and "to annual examination of the eyes with prescription for glasses, also treatment for acute eye diseases and injuries by designated specialists". It requires no further comment to show that the agreement was one by petitioner to furnish all the ser-

vices mentioned other than first-aid treatment, through its own appointees.

Petitioner makes much of the fact that the so-called indemnities are payable to the insured under the terms of the policy and to the further fact that the provision contained in the application authorizing petitioner to pay the so-called indemnities directly to its appointees may be revoked at any time by the insured. We attach but little significance to these considerations. The policy provision regarding the payment of indemnities to the insured was necessarily inserted because required by the act (Stats. 1917, p. 957) and the provision in the application was no doubt inserted to modify the requirement of the act as far as possible. It is apparent that the appointees of petitioner were to be compensated according to a schedule of fees adopted by petitioner and we cannot agree with petitioner's apparent claim that petitioner would not be liable to its appointees for services rendered to the policyholders. The authorization of direct payment in the application was merely a convenient method of insuring payment to its appointees for services rendered to the policyholder and of avoiding the possibility of being required to pay both the policyholder and its appointees in the event that the policyholder failed to pay said appointees after receiving the so-called indemnities from the petitioner. It may be further noted that the notice of revocation by the insured was not to affect petitioner's authority with respect to services "for any condition or its complications having inception prior to such written notice".

Petitioner also takes exception to the word "employees" as applied by respondent and *amici curiae* to petitioner's appointees. It may be true that a member of the learned professions may not be an "employee" of a corporation in the strict sense of the word, if that term is used to signify such right of control over the practitioner in the details of his work as to render the corporation liable under the doctrine of *respondeat superior*. (See *Pilger* v. *City of Paris, supra.*) But we need not quibble here over the use of terms as it is immaterial whether the appointed practitioners are termed employees, agents or appointees of the petitioner. The fact remains that petitioner's agreement was to furnish, in consideration of the premium paid by the

insured, the services of doctors and dentists who were to be appointed, engaged, hired or employed by petitioner for the purpose of furnishing such services. Any such agreement is clearly condemned as unlawful and against public policy by the authorities above cited.

Petitioner discusses at some length the social and economic need for health insurance. We assume that petitioner refers to compulsory health insurance or some form of health insurance similar to that offered in petitioner's policy as health insurance policies are now provided for under the above-mentioned act. It is a matter of common knowledge that the general subject of health insurance has provoked much discussion in recent years and it is also a matter of common knowledge that there is a great diversity of opinion concerning this subject. There are those who believe that the time has come when the rules so firmly established by the authorities above cited should be changed or modified in certain respects. We do not feel called upon, however, to discuss this question, for if the established rules are to be changed or modified, we deem it to be the province of the legislature rather than the courts to determine when, to what extent and under what conditions and restrictions, the change or modification should be made. ██ In this connection it is of interest to note the legislative history of Senate Bill No. 471, introduced at the 1935 session of the legislature, as shown by the legislative journals of which we may take judicial notice. (*French* v. *Senate*, 146 Cal. 604 [80 Pac. 1031, 2 Ann. Cas. 756, 69 L. R. A. 556].) Said bill was apparently introduced for the purpose of legalizing the type of insurance provided by the policy before us. In the Assembly Journal of May 23, 1935, at page 22, it appears that the assembly amended the bill to eliminate all reference to dentistry. In the Assembly Journal of June 12, 1935, at pages 42 to 46, it appears that the bill was amended to eliminate all reference to medicine and the following was added: ''This chapter shall not authorize and nothing in this chapter shall be construed as authorizing any corporation or any insurer licensed hereunder or any person other than a holder of a valid and unrevoked physicians and surgeons certificate to practice medicine and surgery directly or indirectly or to furnish professional services of physicians and surgeons.'' The bill was thereafter permitted

to die on the files without being brought up for final passage. It thus appears that the legislature was not yet prepared to change or modify the established rules prohibiting the corporate practice of medicine and dentistry.

Petitioner cites and relies upon *Physicians' Defense Co.* v. *Cooper,* 199 Fed. 576 [47 L. R. A. (N. S.) 290]. There the company failed to comply with the insurance laws requiring an insurance company to file a bond and to obtain a certificate of authority. The company claimed the right to do business without complying with the requirements of the insurance laws and sought an injunction against the insurance commissioner. This was denied. On appeal the court stated, ''But one question is presented on this appeal, which is whether the company is transacting an insurance business within the meaning of the statutes of California relating to the subject.'' The court decided that the company was transacting an insurance business and affirmed the judgment. That case is not in point as no question was raised concerning the legality of the company's contract and said question was not considered or determined by the court. Petitioner also relies upon the language of the court in *Pilger* v. *City of Paris Dry Goods Co.,* 86 Cal. App. 277, at page 283 [261 Pac. 328], where it is indicated that a corporation may undertake to furnish the services of a physician. It is sufficient to state that said language was not necessary to the decision but we may further state that if said language is to be construed as sustaining petitioner's position here, it is not in line with the great weight of authority.

Upon oral argument, it was contended by petitioner that the power of the respondent insurance commissioner in determining whether the policy complied with the ''requirements of law'' was limited to a determination of whether the policy contained the standard provisions prescribed by the act. (Stats. 1917, p. 957.) In other words, petitioner took the position that regardless of whether the approval and issuance of the policy would result in petitioner's engaging in the unlawful practice of medicine and dentistry, respondent was required to approve the policy if it contained the standard provisions prescribed by said act. While we are of the opinion that this contention may not be sustained, we believe that in any event petitioner was not

entitled to judgment directing the issuance of the writ of mandate. If the approval and issuance of petitioner's policy would result in petitioner's engaging in the unlawful practice of medicine and dentistry as above stated, then the writ should not issue to compel the approval of the policy as the writ should never issue to compel an act which will tend to aid an unlawful purpose. (16 Cal. Jur., p. 780.)

The judgment is reversed.

Nourse, P. J., and Sturtevant, J., concurred.